**Annie S. ADAMS, Administratrix of the Estate of F. Lee Weiss, Plaintiff,**

v.

**Sheriff DREW, Deputy Goss, Nurse Holcomb, Doctor Gonzaga, Willard Smith, and Deputy Boczar, Defendants.**

Civ. A. No. 2:92cv642.

United States District Court,
E.D. Virginia,
Norfolk Division.

Nov. 15, 1995.

David Michael Young, McGuire, Woods, Battle & Boothe, Norfolk, VA, for plaintiff.

John Dinshaw McIntyre, Amy Moss Levy, Elizabeth Hoyes Esinhart, Willcox & Savage, P.C., Norfolk, VA, for Sheriff Drew, Deputy Goss, Mr. Smith.

Jeff Wayne Rosen, David Ian Tenzer, Adler, Rosen & Peters, P.C., Virginia Beach, VA, for Ms. Holcomb, Doctor Gonzaga.

John Dinshaw McIntyre, Amy Moss Levy, Willcox & Savage, Norfolk, VA, for Deputy M.J. Boczar.

### OPINION AND ORDER

DOUMAR, District Judge.

This matter is currently before the court on defendants' motions for summary judgment. For the following reasons, the motion is **GRANTED** in part and **DENIED** in part.

### I. Factual and Procedural Background

F. Lee Weiss ("Weiss") pled guilty to conspiracy to file false income tax returns on May 7, 1992. On July 16, 1992, this court sentenced Weiss to 27 months incarceration and 36 months of supervised release, and ordered him to make restitution of $42,619.00 to the United States. On July 6, 1992, Weiss filed this action pursuant to 42 U.S.C. § 1983. Weiss alleged that while in the Virginia Beach Correctional Center ("VBCC") awaiting adjudication of the federal charges, he was denied adequate medical treatment, that defendants improperly allowed other inmates to learn that he had AIDS, and that as a result of that knowledge, he was attacked by other inmates on April 27, 1992, after asking that he be moved from the cell block in which he was incarcerated because of his belief that he would be assaulted. His complaint was conditionally filed on August 14, 1992.

On June 11, 1993, Weiss was ordered to pay a partial filing fee of $80.48. On September 3, 1993, after Weiss remitted that amount to the court, his complaint was ordered filed, two institutional defendants were dismissed,[1] and defendants Drew and Goss were ordered to file responsive pleadings. On September 30, 1993, Weiss was permitted to amend his complaint to add defendants Holcomb, Gonzaga, Smith and Boczar, his initial request for counsel was denied, and all defendants were ordered to file responsive pleadings.[2] After some difficulty in serving all of the defendants, the defendants began to file responsive pleadings: defendant Drew both answered the complaint and moved to dismiss on October 26, 1993; defendants Holcomb and Gonzaga moved for summary judgment on November 19, 1993; defendant Goss answered the complaint and moved to dismiss on November 19, 1993; and defendants Smith and Boczar answered the complaint and moved to dismiss on December 1, 1993.

On February 7, 1994, Weiss asked for production of numerous documents pertaining to this matter and moved for a jury trial, and on February 10, 1994, asked that he be permitted to certify a class on behalf of all persons with the human immunodeficiency virus (HIV), present and future, incarcerated in the Virginia Beach Correctional Center. Defendants Drew, Goss, Smith and Boczar registered their opposition to discovery on February 16, 1994. On March 15, 1994, the court denied Weiss' motion for a jury trial and to certify a class, and denied in part and granted in part plaintiff's motion for document production. The court also converted defendants' motions to dismiss into motions for summary judgment pursuant to Rule 12(b) of the Federal Rules of Civil Procedure.

Defendants Drew, Goss, Smith and Boczar responded to the request for production of documents on April 4, 1994. On June 17, 1994, the court made further rulings on

---

1. Those defendants were the Virginia Beach Correctional Center and Correctional Medical Services.

2. The defendants therefore are: Sheriff Drew, Deputy John Goss, Beth Holcomb (Director of Nurses at VBCC), Dr. Gonzaga (physician at VBCC), Maj. Willard Smith, administrator of VBCC, and Deputy Michael J. Boczar.

Weiss' request for documents, and ordered him to file any response to defendants' motions for summary judgement within 20 days, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975). Weiss did not answer, except to write to the court explaining that he had developed full blown AIDS and could no longer pursue his claims.

On October 17, 1994, the court appointed David Young, of McGuire, Woods, Battle & Boothe, to serve as counsel for Weiss. On December 13, 1994, the court granted Weiss 20 days in which to respond to defendants' motions for summary judgment. Weiss filed his opposition to defendants' motions for summary judgment on January 3, 1995; defendants responded on January 9, 1995. Also on January 9, 1995, Weiss requested oral argument on the defendants' motions for summary judgment.

On February 3, 1995, Weiss' counsel informed the court that Weiss had died earlier that week. On June 27, 1995, Weiss' counsel moved to substitute Annie S. Adams, Administratrix of the Estate of F. Lee Weiss, as plaintiff in lieu of the deceased plaintiff. The court granted that motion on July 6, 1995.

All parties have submitted briefs on the matter. Oral argument was heard on September 28, 1995. This matter is now ripe for adjudication.

## II. Legal Standard—Summary Judgment

To sustain a motion for summary judgment, the court must find that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The party seeking summary judgment is initially responsible for identifying the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). When this burden is met, the non-moving party must show, through affidavits or other proof, that a genuine issue of material fact does exist. *Catawba Indian Tribe v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993). "The mere existence of a scintilla of evidence" will not support this finding. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

Summary judgment must be entered against a non-moving party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact....'" *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. In deciding the motion, the court must view all inferences drawn from the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), but the nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another. *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1260 (4th Cir.1993) (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985)) (internal quotations omitted).

## III. Analysis

There are three grounds for this § 1983 complaint. Count One alleges that Weiss received inadequate medical treatment while incarcerated in the Virginia Beach Correctional Center. Count Two alleges that Weiss' constitutional rights were violated by the unlawful disclosure of confidential medical information. Finally, Count Three alleges that Weiss' constitutional rights were violated by defendants' failure to heed a specific warning of immediate and substantial danger to plaintiff's safety as a result of the disclosure of his condition. Plaintiff seeks compensatory damages.

At the commencement of oral argument on September 28, counsel for plaintiff informed the court that plaintiff was withdrawing Count One, i.e., the claim of inadequate medical treatment. Accordingly, Count One is **DISMISSED**. That leaves only Counts Two and Three, which are discussed below.

### A. Disclosure of Confidential Medical Information

#### 1. *Constitutional Right to Prevent Disclosure of Medical Information*

Count Two alleges that the defendants violated Weiss' constitutional rights by

unlawfully disclosing confidential medical information. Specifically, Weiss alleges that the medical staff at VBCC acted in a manner that led other inmates to discover that he was receiving AZT, a drug strongly associated with HIV. Weiss avers that the prisoners receiving medication lined up "at the medical cart" to receive their medication. Weiss Aff. ¶ 7. Consequently, Weiss contends, "prisoners' medical records were displayed in full view" and it was possible to "read another prisoner's medical chart when standing in line to receive medication." *Id.; see* Pl.Br. at 3 (prisoners could see medical chart by looking over another inmate's shoulder). Weiss states that a fellow prisoner told him that he had seen Weiss' chart in this manner, and learned that Weiss was taking AZT, and that because he knew that AZT was used to treat persons with AIDS, the fellow prisoner was able to conclude that Weiss had the disease. *Id.,* ¶ 8. Defendant Holcomb, the director of nurses at VBCC, disputes that inmates had access to any medical records or "medication administration records." Holcomb Aff., ¶ 12. Defendants Drew and Smith also aver that inmates' medical files are not available for viewing by other inmates. Drew Aff., ¶ 6; Smith Aff. ¶ 5.

Even assuming the plaintiff's factual allegation in the light most favorable to her, the court finds that the plaintiff's claim must fail as a matter of law.

Plaintiff's specific legal contention is that the U.S. Constitution protects unauthorized disclosure of confidential medical information, based on a "right of privacy." It is not clear from the plaintiff's brief which constitutional provision provides the basis for this claim. Such a right has been found, for example, lurking in the emanations of several constitutional amendments contained in the Bill of Rights, *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), and in the substantive component of the Due Process Clause of the Fourteenth Amendment, *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The cases cited favorably by plaintiff are as equally ambiguous as the complaint, although they appear to rest on the liberty interest protect-ed by Due Process Clause of the Fourteenth Amendment.

At the outset, it bears emphasis that the Supreme Court has stated that there is no "*general* right to privacy," but that this area of law is "left largely to the states." *Katz v. United States,* 389 U.S. 347, 350–51, 88 S.Ct. 507, 510–11, 19 L.Ed.2d 576 (1967). In *dictum,* the Court has summarized its jurisprudence as recognizing that the Constitution protects, in general, two types of interests: (1) an individual interest in avoiding disclosure of personal matters and (2) the interest in independence in making certain kinds of important decisions. *Whalen v. Roe,* 429 U.S. 589, 599–600 & nn. 25–26, 97 S.Ct. 869, 876 & nn. 25–26, 51 L.Ed.2d 64 (1977). If the right exists in the case at bar, it comes within the ambit of the former interest.

Protecting the right of a person to make individual decisions, the second interest identified in *Whalen,* has dominated the Supreme Court's privacy cases. *E.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right to make decision about abortion); *Pierce v. Society of Sisters,* 268 U.S. 510, 535, 45 S.Ct. 571, 573, 69 L.Ed. 1070 (1925) (right to make decision about child's education); *see Whalen,* 429 U.S. at 600 n. 26, 97 S.Ct. at 876 n. 26 (collecting cases), *Zablocki v. Redhail,* 434 U.S. 374, 385, 98 S.Ct. 673, 680–81, 54 L.Ed.2d 618 (1978) (same). But unlike the "individual decision" line of cases, the Court cannot be said to have announced a clear rule regarding the right to privacy in preventing disclosure of personal information.

In *Whalen,* for example, plaintiffs challenged a New York State statute requiring the establishment of a centralized government database of names and addresses of individuals who obtained drugs by prescription. All doctors were required to fill out an official form when prescribing drugs; the form was then forwarded to the state health department by the pharmacy filling the prescription. *Whalen,* 429 U.S. at 593, 97 S.Ct. at 873. The statute was designed to aid in enforcing laws against misuse of dangerous and illicit drugs. To guard against unauthorized disclosure of the identity of patients, the statute provided for imprisonment and

fines for willful violations. *Id.* The Court avoided pronouncing a general rule that medical records were constitutionally protected. Instead, the Court simply analyzed the protections contained in the New York statute, and concluded that, on its face, with respect to the two interests, the law did not "pose a sufficiently grievous threat to either interest to establish a constitutional violation." *Id.* at 603–04, 97 S.Ct. at 878. The Court, highlighting the safeguards in the statute, underscored the narrowness of its holding:

> [w]e are not unaware of the threat to privacy implicit in the accumulation of vast amounts of personal information [by the state]. [The collection] of such data.... is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures. [We] [r]ecognize[ ] that *in some circumstances that duty arguably has its roots in the Constitution.* [Because of the protections contained in the New York statute] we.... need not, and do not, decide any question which might be presented by the unwarranted disclosure of accumulated private data—whether intentional or unintentional—or by a system that did not contain comparable security provisions.

*Id.* at 605–06, 97 S.Ct. at 879 (emphasis added).

Similarly, in *Nixon v. Administrator of Gen'l Services,* 433 U.S. 425, 467–68, 97 S.Ct. 2777, 2802, 53 L.Ed.2d 867 (1977), the Court avoided any pronouncement about a "privacy" rule regarding disclosure of personal information based on the Fourteenth Amendment. There, President Nixon, by then out of office, challenged the constitutionality of the Presidential Recordings and Materials Preservation Act, Pub.L. No. 93–526, 88 Stat. 1695 (1974), which directs the Administrator of General Services to take custody of presidential papers. The Court's examination of President Nixon's privacy argument rested primarily on whether he had a reasonable expectation of privacy under the Fourth Amendment. *Nixon,* 433 U.S. at 455–66, 97 S.Ct. at 2796–2801. *Accord, J.P. v. DeSanti,*

653 F.2d 1080, 1088–90 (6th Cir.1981) (finding that *Whalen* and *Nixon* do not announce a constitutional rule that protects private information from disclosure).

In stating in *Whalen* that the right to privacy encompassed the right to prevent the disclosure of personal information, the Court cited to four cases in a footnote. Fairly read, none of these cases can be construed as dictating the rule urged by plaintiff. The first citation is to Justice Brandeis' famous dissent in *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928), where he characterized the "right to be let alone" as "the right most valued by civilized man." Similarly, *Whalen* cites to concurring and dissenting opinions in *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 79, 94 S.Ct. 1494, 1526, 39 L.Ed.2d 812 (1974) (Douglas, J., dissenting); *id.* at 78, 94 S.Ct. at 1525 (Powell, J., concurring). As with Justice Brandeis' dissent in *Olmstead,* the concurrence and dissent, no matter how eloquent, have no dispositive force.[3]

*Whalen* next cites to a statement in *Griswold v. Connecticut, supra,* quoting this passage: "[t]he First Amendment has a penumbra where privacy is protected from government intrusion." *Whalen,* 429 U.S. at 599 n. 25, 97 S.Ct. at 876 n. 25. No First Amendment right is at stake in the case at bar. Moreover, the Court made clear subsequently that *Griswold* falls within the "individual decision" line of cases in that it protects decisions in matters of childbearing, and thus is not applicable to the issue presented here, the right to protect disclosure of personal information. *Carey v. Population Services Int'l,* 431 U.S. 678, 687, 97 S.Ct. 2010, 2017, 52 L.Ed.2d 675 (1977). It might be argued, of course, that the logical extension of *Griswold,* which invalidated a state statute criminalizing the use of contraceptives as an unconstitutional invasion of the marital bedroom, 381 U.S. at 486, 85 S.Ct. at 1682, is that the state cannot force an individual to divulge the type of contraceptive one used—and that therefore information about an individual's medical prescription is constitutional-

---

**3.** *California Bankers* upheld provisions of the Bank Secrecy Act of 1970, Pub.L. 91–508, 84 Stat. 1114, which, *inter alia,* required banks to report certain currency transactions. It does not stand for the rule urged by plaintiff.

ly protected. But the case at bar is factually distinct from such a hypothetical extension of *Griswold:* here, the question is not whether Weiss was compelled to divulge his medical condition to the state, but whether, once he revealed it, the state had a constitutional duty to protect that information.

The final case cited in *Whalen* is *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). There, the Court, resting on both the First and Fourteenth Amendments, invalidated a Georgia statute which proscribed the mere possession of obscene material. *Dictum* in *Stanley* might be read to support the general right of nondisclosure urged by plaintiff: "[Stanley] is asserting the right to be free from state inquiry into the contents of his library." *Id.* at 565, 89 S.Ct. at 1248. But as *Whalen* makes clear, the state may inquire into medical information regarding an individual; what *Whalen* does not make clear is how far the state must go to protect that information once obtained.

Notwithstanding the seeming ambiguity in *Whalen,* several lower courts have relied on its suggestion that disclosure of personal information is constitutionally protected. *E.g., Plante v. Gonzalez,* 575 F.2d 1119, 1132 (5th Cir.1978), *cert. denied,* 439 U.S. 1129, 99 S.Ct. 1047, 59 L.Ed.2d 90 (1979) (privacy right to "confidentiality" based on *Whalen*); *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir.1980) (same); *Doe v. New York,* 15 F.3d 264, 267 (2d Cir.1994) (person infected with HIV has constitutional right to privacy based on *Whalen* ).

Whether or not disclosure of personal information is protected, no controlling authority exists which extends it to medical information. *Plowman v. U.S. Dept. of the Army,* 698 F.Supp. 627, 633 (E.D.Va.1988) (Ellis, J., presiding). The Fourth Circuit has implicitly acknowledged that public disclosure of private medical information may at some point trigger constitutional protection, but has explicitly avoided passing on the contours of such a right. *Watson v. Lowcountry Red Cross,* 974 F.2d 482, 487–88 & n. 9 (4th Cir.1992) (rejecting challenge by Red Cross that disclosure to court of blood donor's identity violates donor's constitutional privacy

rights). And the Fourth Circuit has upheld a requirement that prisoners divulge personal information about their family background to prison officials. *Taylor v. Best,* 746 F.2d 220, 225 (4th Cir.1984), *cert. denied,* 474 U.S. 982, 106 S.Ct. 388, 88 L.Ed.2d 340 (1985). Any privacy interest the prisoner had, the court reasoned, was outweighed by interests in assuring prison security. *Id.* A brief quotation of *Whalen* in *Taylor* might be read to favor the constitutional rule urged by plaintiff. The *Taylor* court noted that privacy "includes an individual interest in avoiding disclosure of personal matters." 746 F.2d at 225 (citing *Whalen* ) (internal quotations omitted). The court reads this as *dictum.* Furthermore, any inference that *Taylor* created a constitutional rule in this Circuit was foreclosed by the explicit refusal to address the same question in *Watson,* and the fact that the *Watson* court did not mention *Taylor. Taylor* is not far afield from *Whalen,* in that it involved the disclosure of private information to government officials for a legitimate purpose. It did not involve the facts facing the court here, namely, the apparent inadvertent disclosure of private information to other inmates.

Other courts that have addressed the question are divided. *Compare Harris v. Thigpen,* 941 F.2d 1495, 1513 (11th Cir.1991) (assuming that HIV-positive inmates have constitutionally protected privacy interest in preventing disclosure of their status through segregation from the general prison population, but balancing that interest against legitimate correctional goals and maintenance of institutional security and finding no constitutional violation); *United States v. Westinghouse Elec. Corp.,* 638 F.2d 570, 577 (3d Cir.1980) (in non-prison case, employee's personal medical records protected by right to privacy); *Nolley v. County of Erie,* 776 F.Supp. 715, 731 (W.D.N.Y.1991) (holding that prison inmates protected by a constitutional right to privacy from unwarranted disclosure of their HIV status through the placement of red stickers on HIV-positive inmates' documents and personal effects); *Doe v. Coughlin,* 697 F.Supp. 1234, 1238 (N.D.N.Y.1988) (holding that prisoners entitled to some protection against non-consen-

sual disclosure of diagnosis of AIDS through involuntary placement in a separate dormitory for AIDS patients only, and, after balancing against legitimate penological interests, finding a constitutional violation); *Woods v. White,* 689 F.Supp. 874, 876 (W.D.Wis.1988), *aff'd,* 899 F.2d 17 (7th Cir.1990) (holding that prisoner has constitutional right to privacy in medical records in case where defendants discussed prisoner's HIV-positive status with non-medical staff and other inmates), *with Doe v. Wigginton,* 21 F.3d 733, 740 (6th Cir.1994) (rejecting notion that Constitution encompasses a right to nondisclosure of private information in the context of release of information regarding prisoner's HIV status to corrections officer); *cf. Baez v. Rapping,* 680 F.Supp. 112, 115 (S.D.N.Y.1988) (rejecting privacy right challenge when hospital issued precaution notice to correctional facility to avoid petitioner's bodily fluids).

In light of this divided judicial landscape, given the lack of clear direction from the Supreme Court or the Fourth Circuit, and based on the facts of this case, this court is hesitant to discover new "constitutional" rights regarding "privacy." As the Supreme Court noted in *Katz,* "[v]irtually every governmental action interferes with personal privacy to some degree." 389 U.S. at 350 n. 5, 88 S.Ct. at 510 n. 5. This is especially so with the growth of the modern regulatory state and the rapid development of technology. *See Whalen,* 429 U.S. at 605, 97 S.Ct. at 879 (noting threat to privacy posed by governmental actions in accumulating personal information). Moreover, "privacy" is an elastic concept, one not susceptible to precise definition. Lacking a commonly accepted definition, notions of privacy are potentially subject to the shifting sands of public mores, and to the personal predilections of the judicial mind. *Cf. Griswold,* 381 U.S. at 509, 85 S.Ct. at 1695 (Black, J., dissenting) ("privacy is a broad, abstract and ambiguous concept which can easily be shrunken in meaning ...") (internal quotation omitted). Courts should therefore be extremely cautious about embracing a doctrine which would involve them in "balancing almost every act of government.... against its intrusion on a concept so vague, undefinable, and all-encompassing as individual privacy." *J.P. v. DeSanti,* 653 F.2d 1080, 1090 (6th Cir.1981).

The court recognizes that privacy interests—distinct from a constitutional right—are at stake. The question is not whether individuals regard medical information about themselves as private, for they surely do, but whether the Constitution protects such information. Certainly, legislatures have recognized the need to protect privacy interests. For example, Virginia recognizes a privilege that protects communications between a doctor and patient. Va.Stat. Ann. § 8.01–399 (Michie Supp.1995). By statute, records maintained by governments on individuals are protected. *See, e.g.,* 5 U.S.C. § 552a (federal Privacy Act); Va.Stat. Ann. § 2.1–377 to 2.1–386 (Michie 1995) (Virginia Privacy Protection Act). Congress is currently debating legislation to protect medical records from disclosure. *See* John Schwartz, *Medical Records Privacy Bill Gets Airing at Senate Hearing,* Wash. Post, Nov. 15, 1995, at A2; S. 1360, 104th Cong., 1st Sess. (1995). But merely because an interest is protected by the legislature does not mean that it is also safeguarded by the Due Process Clause.

Whenever the judiciary "breathes.... further substantive content into the Due Process Clause," it unavoidably enmeshes itself deeply into another part of the "governance of the country without express constitutional authority." *Moore v. City of East Cleveland,* 431 U.S. 494, 544, 97 S.Ct. 1932, 1959, 52 L.Ed.2d 531 (1977) (White, J., dissenting). The rule urged by plaintiff would require the courts to double as prison administrators, second-guessing a myriad of decisions about whether a prisoner's privacy rights had been violated.[4] The task would be gargantuan. Aside from the military, the prison is quite possibly the least "private" of our institutions. Normal aspects of privacy to which

---

4. Even if the right exists, it would not be absolute, and would be balanced against the government's interest in administering the prisons. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987) (regulations or practices that impinge on inmates' constitutional rights valid if "reasonably related" to legitimate penological interests).

most humans are accustomed do not exist in the prison.

The case at bar aptly illustrates the difficulty in undertaking such an examination. The prison officials here did not draw a distinction between Weiss and other prisoners in handling the dispensation of medicine. The medical chart of each prisoner apparently accompanied the dispenser of the drugs. This arrangement was obviously necessary in order to ensure that each prisoner received the·prescribed medicine; if the wrong medicine was dispensed to the wrong prisoner, serious problems might ensue. The revelation to another inmate of the medical information contained on Weiss' chart was apparently inadvertent. *See* Pl.Br. at 3 (it was a "simple matter" for one prisoner to look over another's shoulder to see fellow prisoner's medical record). The adoption of the rule urged by plaintiff would enmesh the court in second-guessing the prison officials' decision about whether the prisoners should line up as a group to receive their medicine, or should receive it based on individual appointments.[5]

The courts are ill-suited for such a role. Absent clear authority from the Fourth Circuit or the Supreme Court, this court does not find as a matter of law, under the facts of this case, that a constitutional right to privacy of medical information exists. Summary judgment must be entered for defendants as to Count Two.

### 2. *Statutory Violations*

■ In her brief submitted in response to defendants' summary judgment motions, plaintiff argues for the first time that the procedure used to dispense medication at VBCC resulted in a violation of Virginia law. *See* Va.Stat.Ann. § 32.1–36.1 (Michie 1992 & Supp.1995). The statute prohibits the disclosure of results of a test for HIV, but provides certain exceptions for health care facilities and other medical personnel. Although the court's cursory reading of the provision is

that it extends only to test results, not to prescriptions used to combat HIV, the court expressly declines to address this question. To date, the Virginia courts have not passed on this statute. Inasmuch as this claim is not of constitutional dimension—which § 1983 is designed to address—and that it is apparently a case of first impression in any court in Virginia, the court declines to exercise supplemental jurisdiction over this claim. *See* 28 U.S.C. § 1367(c)(1) (district court may decline supplemental jurisdiction if claim raises novel issue of state law).

### B. Disregard of Warning of Immediate and Substantial Danger to Weiss' Safety

■ Plaintiff argues that defendants' motions for summary judgment should not be granted because a material factual dispute exists as to the circumstances surrounding the assault on Weiss which occurred on April 27, 1992. The parties agree that on that date, Weiss was assaulted by several inmates, and defendants do not dispute that he was assaulted because of his HIV-positive status. The parties disagree, however, as to the standard to which prison officials are held in an assault on a prisoner by other prisoners. Both plaintiff and defendants rely on cases articulating the standard of care due an inmate under the Eighth Amendment. At the time of the assault, however, Weiss had not yet pled guilty, and therefore, this case is governed by the standards pertaining to pretrial detainees rather than convicted prisoners. Accordingly, this case falls under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment. *City of Revere v. Massachusetts Gen. Hosp.,* 463 U.S. 239, 244, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983).

■ The standard of care owed to a pretrial detainee under the Fourteenth Amendment has never been squarely addressed by the Supreme Court. *See Canton v. Harris,* 489 U.S. 378, 388 n. 8, 109 S.Ct. 1197, 1205 n. 8, 103 L.Ed.2d 412 (1989) (standard of medi-

---

**5.** The limited record herein precludes the court from finding, in the alternative, that the practice of VBCC was "reasonably related to a penological interest" under *Turner.* The court notes only that VBCC is a jail; it is not a private doctor's

office. The standards of private treatment that an average person may expect do not apply in an institutional setting, where several, if not hundreds, of prisoners must be attended to simultaneously.

cal care due a pretrial detainee under Fourteenth Amendment expressly left open in *Revere* and would remain unresolved in *Canton*). The Fourth Circuit has expressly affirmed the use of a jury instruction modeled on the "deliberate indifference" standard in a case involving the jail suicide of a pretrial detainee. *Hill v. Nicodemus*, 979 F.2d 987, 991–992 (4th Cir.1992). The Court pointed to other Circuits which have similarly held. *Id.* at 991 and n. * (citing, e.g., *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir. 1992); *Bowen v. City of Manchester*, 966 F.2d 13 (1st Cir.1992); *Hall v. Ryan*, 957 F.2d 402 (7th Cir.1992)). This court will therefore apply the "deliberate indifference" standard to this case. It bears emphasis, however, that if a defendant's conduct is found to be merely negligent, then no constitutional deprivation has occurred. *Davidson v. Cannon*, 474 U.S. 344, 347–48, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986) (holding that Due Process Clause of the Fourteenth Amendment is not triggered by "mere negligent" lack of due care by prison officials who fail to protect an inmate from injury at the hands of other inmates).

The Supreme Court recently elaborated on the term "deliberate indifference" in *Farmer v. Brennan*, —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), a case involving the failure of prison officials to protect a preoperative transsexual inmate from sexual assaults by other inmates. Under *Farmer*, a prison official cannot be liable under the Eighth Amendment "unless the official knows of and disregards an excessive risk of harm to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*, at ——, 114 S.Ct. at 1979.

■ Whether the prison official had knowledge of a substantial risk is a "question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.*, at ——, 114 S.Ct. at 1981. The Court went on to illuminate this point:

> For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it ... such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id.*, at —— – ——, 114 S.Ct. at 1981–1982 (internal quotations and cite omitted). The Court cautioned, "[i]t is not enough merely to find that a reasonable person would have known, or that the defendant should have known ..." *Id.* at n. 8. "Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.*, at ——, 114 S.Ct. at 1982. This does not mean, however, that a prison official can attempt to avoid knowing about a danger in order to escape liability. *Id.* at n. 8.

■ A genuine issue of material fact still remains as to defendant Goss. Weiss alleges that he gave defendant Goss a grievance form shortly before his attack on April 27, 1992, that indicated that he needed to be moved because the others in the cell block did not want him there because he had AIDS. The form states that "the inmates in this block do not want to be housed with an inmate with the HIV virus. Therefore I need to be moved immediately." Weiss further alleges that when he gave defendant Goss this grievance form, he verbally informed Goss that he would be beaten if he was not moved. Additionally, Weiss alleges that other prisoners yelled at Goss that if Weiss was not moved, "blood would be spilt." Weiss Aff. ¶ 11. Defendant Goss rejoins that he had no knowledge or forewarning of any threat of bodily harm to Weiss, that during his routine checks of the cell block, no reason to believe that Weiss was in danger arose, and that at most, his actions or inactions rise only to the level of mere negligence. Goss Aff. ¶¶ 5, 7. The "Incident Report" filed by

Goss on April 27 states that Weiss handed Goss a grievance form in which he stated that the inmates in 3P knew he had HIV and that they "were asking that Weiss be moved." But Goss insists that "[n]o inmate stated that they would harm Weiss in my presence."

Weiss' and defendant's accounts are flatly contradictory, and thus raise a genuine issue of material fact; if Weiss' statement is to be believed, defendant Goss both knew of and disregarded an excessive risk to the Weiss' safety. Such contradictory statements are sufficient to defeat defendant Goss' motion for summary judgment. *See Pressly v. Hutto,* 816 F.2d 977, 979 (4th Cir.1987).

 Summary judgment is appropriate, however, with regard to the other defendants involved in this count—defendants Drew, Smith, and Boczar.[6] The court first addresses the claim against Drew, the county sheriff, and Smith, the jail administrator. Although the doctrine of *respondeat superior* is generally inapplicable in § 1983 suits, *Monell v. Department of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978), supervisory defendants may be held liable if they tacitly authorized or were indifferent to a specified condition. *See Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir. 1984); *Miltier v. Beorn,* 896 F.2d 848, 854 (4th Cir.1990). Such liability for the acts of a subordinate is not based upon a theory of *respondeat superior,* "but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Slakan,* 737 F.2d at 372 (citation omitted). A plaintiff "not only must demonstrate that [he] face[s] a pervasive and unreasonable risk of harm from some specified source, but he must show that the supervisor's corrective inaction amounts to deliberate indifference or 'tacit authorization of the offensive [practices].'" *Id.* at 373 (quotation omitted).

 Deliberate indifference or tacit authorization cannot be ascribed to either Drew

or Smith. Neither man had knowledge or notice that Weiss was in danger of being attacked by other inmates. Drew Aff. ¶ 10; Smith Aff. ¶ 6. A prison official may not be held liable unless he "knows of and disregards an excessive risk to inmate health or safety." *Farmer,* —— U.S. at ——, 114 S.Ct. at 1979. "Actual knowledge or awareness on the part of the alleged inflictor" is essential. *Brice v. Virginia Beach Correctional Ctr.,* 58 F.3d 101, 105 (4th Cir.1995). Plaintiff suggests that knowledge might be imputed to Drew and Smith because "it is not clear at this stage of the proceeding" whether Goss passed along the grievance form to his superiors. But plaintiff offers no evidence for this claim. A nonmoving party in a summary judgment motion cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another. *Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1260 (4th Cir.1993). Nor can it be said that an "inference can be drawn" from the fact that "risk was obvious" under the teaching in *Farmer* in order to hold Drew or Smith liable. Weiss, then incarcerated in Cell 3P, gave the grievance note to Deputy Goss at 6:50 p.m. on April 27, 1992. Weiss Aff. ¶ 11. Apparently, soon after Goss left the vicinity, other inmates began beating Weiss. *Id,* ¶ 12. Plaintiff offers no evidence that Drew or Smith were alerted to the note in this short time period. Drew and Smith specifically aver that they were not subjectively aware of any danger to Weiss. In addition, they did not believe that the cell block in which Weiss was housed posed any specific danger to him. Drew Aff. ¶ 10; Smith Aff., ¶ 6. Once the attack on Weiss occurred, he was moved to another cell. In short, neither Drew nor Smith had a subjective awareness of the danger to Weiss that would subject them to liability.

The same conclusion can be reached about the awareness of defendant Boczar, then a deputy sheriff at the jail. He denies knowledge that the other inmates threatened Weiss, or that the cell block posed a danger to Weiss. Boczar Aff., ¶ 4. Plaintiff has not offered evidence to the contrary. An addi-

---

6. There is no suggestion that the two medical personnel, defendants Holcomb and Gonzaga, are implicated in this count.

tional claim is made with regard to Boczar, however, that must be addressed. Plaintiff alleges that Boczar placed Weiss in cell 3P in "retaliation" following an incident in which Weiss refused a liquid lunch erroneously provided by Boczar. Plaintiff urges the court to "infer that this was a deliberate act of punishment by Boczar" and argues that cell 3P was populated by "known troublemakers." Such an inference, based on a speculative allegation unsupported by evidence, cannot be drawn, particularly in light of the affidavit of Cassandra Wilburn, the Classification Supervisor at VBCC. She states that Boczar would have had no authority to make classification designations—i.e., assignments to cell blocks—and that her review of Weiss' classification records indicates that a classification counselor, not Boczar, transferred Weiss to cell 3P. Wilburn Aff. ¶¶ 2, 3. Moreover, Boczar had no role in requesting Weiss' transfer. *Id.*, ¶ 5. In sum, Boczar cannot be liable under § 1983 unless he had subjective knowledge of the risk to Weiss or deliberately placed Weiss at risk. No material fact exists which would support such a claim.

### IV. Summary

In summary, as stated *supra* at 6, Count One of the Complaint is **DISMISSED**. Defendants' motion for summary judgment on Count Two of the Complaint is **GRANTED**. The motion for summary judgment by defendants Drew, Smith, and Boczar regarding Count Three of the Complaint is **GRANTED**. The motion for summary judgment by defendant Goss regarding Count Three of the Complaint is **DENIED**.

Trial is scheduled for January 4, 1996.

The Clerk of the Court is **DIRECTED** to forward copies of this opinion and order to counsel for the parties.

**IT IS SO ORDERED.**